UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

BAMCOR LLC, an Ohio                 )
Corporation; MICHAEL WILLIS,        )
BRIAN CAPUTO,                       )
                                    )
            Plaintiffs              )
                                    )
        v.                          )   Case No. 2:08 cv 194
                                    )
JUPITER ALUMINUM CORPORATION,       )
an Illinois Corporation,            )
                                    )
            Defendant               )

OPINION AND ORDER

This matter is before the court on the Motion to Exclude
Expert Testimony of Robert Carbonara and Jeffrey Bookwalter [DE
115] filed by the Defendant, Jupiter Aluminum Corporation, on
March 1, 2010; the Motion for Partial Summary Judgment [DE 117]
filed by Jupiter Aluminum on March 1, 2010; the Motion for
Summary Judgment [DE 120] filed by the plaintiff, Bamcor, LLC, on
March 1, 2010; the Motion to Exclude the Testimony of Steven
Schmid, Ph.D. and Mark Hineman [DE 121] filed by the plaintiff on
March 1, 2010; the Motion to Strike Portions of the Affidavit of
Derrick Titchenell [DE 125] filed by the defendant on April 12,
2010; and the Motion to Strike Affidavit of James L. Balough and
Bamcor's Amendment to Interrogatory Responses [DE 140] filed by
the defendant on October 7, 2010.  For the following reasons, the
Motion to Exclude Expert Testimony of Robert Carbonara and

Jeffrey Bookwalter [DE 115] is DENIED, the Motion for Partial Summary Judgment [DE 117] is GRANTED IN PART and DENIED IN PART, the Motion for Summary Judgment [DE 120] is DENIED, the Motion to Exclude the Testimony of Steven Schmid, Ph.D. and Mark Hineman [DE 121] is DENIED, the Motion to Strike Portions of the Affidavit of Derrick Titchenell [DE 125] is DENIED, and the Motion to Strike Affidavit of James L. Balough and Bamcor's Amendment to Interrogatory Responses [DE 140] is GRANTED.

<u>Background</u>

This matter arises from a contract dispute between the plaintiff, Bamcor, LLC, and Jupiter Aluminum Corporation. Jupiter is an aluminum mill that specializes in mill finish and painted aluminum coils.  In November 2006, Jupiter's Hammond, Indiana plant experienced a fire that damaged much of its mill equipment, including the gearbox in its No. 2 Cold Mill.  Jupiter hired Bamcor, a company specializing in refurbishing and manufacturing fire damaged industrial equipment, to inspect and evaluate the fire damaged equipment to determine whether the equipment could be repaired.  Jupiter asked Bamcor to put together an offer to repair three pieces of equipment, including the gearbox.  Jupiter shipped the equipment to Bamcor's shop in Cleveland, Ohio, so Bamcor could prepare its quote.

On January 11, 2007, Bamcor sent Jupiter a price quotation

to repair and rebuild the gearbox and other equipment.  Paragraph 15 of Bamcor's price quote stated: "If this document is incorporated by reference in a purchase order or other document, any commercial terms and conditions printed on the purchase order or other document shall be null and void."  The quotation further limited Bamcor's liability, specifically providing that Bamcor would not pay lost profits in the event of dispute.

Jupiter responded by sending a purchase order to Bamcor. The top of Jupiter's purchase order stated "per qte g 07-010-1 terms 10% down, 3% per week progressive payments net 10 days". (Purchase Order, Ex. 7 ¶ 1)  Jupiter's terms and conditions were stated on the reverse side, and these specifically provided that Bamcor would be liable for lost profits in the event of a breach.

After receiving Jupiter's purchase order, Bamcor proceded to refurbish and rebuild the gearbox.  This included the fabrication and installation of a new spray bar inside the gear box. One of Bamcor's machine repairmen, Derek Titchenell, performed the work on the gearbox.  In his deposition, Titchenell stated that the spray bar was fitted before installation, but it could not be installed in the gearbox as one piece.  Therefore, the spray bar had to be tightened during installation.  Titchenell then explained that he used loctite, a liquid plastic thread sealant, to create a seal between the fittings and locks to prevent leakage.

Titchenell later supplemented his deposition, stating that the spray bar was installed into the gearbox in one piece and was not manipulated after installation.

Bamcor delivered the rebuilt gearbox to Jupiter in the Spring of 2007. The gearbox was designed to be lubricated by the use of the spray bar that Bamcor installed, but the spray bar had to be fed by an exterior lubrication system at Jupiter. A third-party contractor, Seither & Cherry, installed the gearbox in the No. 2 Cold Mill, and a different contractor, Amex Construction, assembled and connected the exterior lubrication system that fed the spray bar.

Installation was complete, and Jupiter began cold-commissioning the No. 2 Cold Mill in August 2007. Shortly after restarting the plant, Jupiter discovered a blue piece of metal stuck in the gears. Bamcor personnel were called out to inspect and clean the gear teeth that were damaged by the metal. In October 2007, Jupiter hired Amex Construction to remove the oil bath in the gear box by making modifications to the lubrication system and removing the six-inch rise in the lubricant drain line from the gear box. These modifications left the spray bar as the sole source of lubrication. After the modifications were complete, Jupiter began production in the No. 2 Cold Mill. The gearbox ran continuously for a three month period. Jupiter shut

down the No. 2 Cold Mill on December 31, 2007, for the New Year Holiday, and Jupiter restarted the gearbox on January 2, 2008. It ran without problems during the first shift, but during the second shift it began making roaring noises, generating heat, and smoking.

Chuck Woodworth, the head of maintenance at Jupiter, and his maintenance personnel removed the cover on the top of the gearbox and viewed the gears. They could not see the spray bar. Woodworth then tried to remove the spray bar by detaching the exterior flange screws that held it on and pulling on the exterior flange. He was able to move the spray bar only three or four inches. Woodworth proceeded to contact Seither & Cherry, an outside vendor that regularly worked inside the Jupiter plant, to disassemble the gearbox.

Seither & Cherry employees found the spray bar in the bottom of the gear box after they removed the gears and promptly reported this to Woodworth. Woodworth went over to the gearbox and saw the broken piece of the spray bar sitting outside of the gearbox where someone had placed it. The rest of the spray bar assembly remained intact inside the gear box. The broken piece of the spray bar was saved by Jupiter's Chief Engineer, Brian Patrick.

Jupiter was forced to close its No. 2 Cold Mill for approximately nine days for repairs as a result of this incident. Jupiter did not notify Bamcor of the problem and relied on third-party contractors to make the repairs. On January 18, 2008, Patrick sent Bamcor a letter claiming it was going to hold Bamcor responsible for the problems it experienced with the gearbox.

In the months that followed, Jupiter personnel are alleged to have made statements to James L. Balogh, a representative of Gilbane, Inc., "the essence of which" was that Bamcor was technically inept and could not be trusted because of its relationship with insurance companies.

Bamcor filed a complaint in the Cuyahoga County Court of Common Pleas, seeking declaratory judgment and damages for defamation. Jupiter removed this action to the Northern District of Ohio, where it was subsequently transferred to the Northern District of Indiana. Jupiter then filed its answer and counter-claim for breach of contract. During the course of discovery, Bamcor retained two experts, Carbonara and Bookwalter, who intend to testify that based on the nature of the break, the spray bar likely broke from an employee using a tool to leverage the pipe. Jupiter also retained two experts, Schmid and Hineman, who theorize that the spray bar broke as a result of Titchenell tightening the pipes during installation or from excessive pressure.

Jupiter now moves for partial summary judgment, to strike Bamcor's expert witnesses, and to strike Balogh and Titchenell's affidavit. Bamcor similarly requests summary judgment and to strike Jupiter's expert witnesses.

## Discussion

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment is proper only if it is demonstrated that "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Stephens v. Erickson, 569 F.3d 779, 786 (7th Cir. 2009). The burden is upon the moving party to establish that no material facts are in genuine dispute, and any doubt as to the existence of a genuine issue must be resolved against the moving party. Adickes v. S.H. Kress & Company, 398 U.S. 144, 160, 90 S.Ct. 1598, 1610, 26 L.Ed.2d 142, 155 (1970); Stephens, 569 F.3d at 786. A fact is material if it is outcome determinative under applicable law. There must be evidence on which the jury could reasonably find for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202, 212 (1986); Stephens, 569 F.3d at 786; Wheeler v. Lawson, 539 F.3d 629, 634 (7th Cir. 2008).

Summary judgment is inappropriate for determination of claims in which issues of intent, good faith, and other subjective feelings play dominant roles. Ashman v. Barrows, 438 F.3d 781, 784 (7th Cir. 2006). Upon review, the court does not evaluate the weight of the evidence, judge the credibility of witnesses, or determine the ultimate truth of the matter; rather, the court will determine whether there exists a genuine issue of triable fact. Wheeler, 539 F.3d at 634 (citing Anderson, 477 U.S. at 248, 106 S.Ct. at 2510).

In deciding a motion for summary judgment, the trial court must determine whether the evidence presented by the party opposed to the summary judgment is such that a reasonable jury might find in favor of that party after a trial.

> The inquiry performed is the threshold inquiry of determining whether there is the need for a trial--whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.
>
> [T]his standard mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict.
>
> Anderson, 477 U.S. at 250, 106 S.Ct. at 2511

See also Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 149-151, 120 S.Ct. 2097, 2109, 147 L.Ed.2d 105, 120-122 (2000)

(setting out the standard for a directed verdict); Celotex Corp.,
477 U.S. at 322-23, 106 S.Ct. at 2553; Stephens, 569 F.3d at 786;
Argyropoulos v. City of Alton, 539 F.3d 724, 732 (7th Cir. 2008)
(stating that a genuine issue is one on which a reasonable fact
finder could find for the nonmoving party); Springer v. Durfling-
er, 518 F.3d 479, 483 (7th Cir. 2008)(stating that a genuine
issue exists and summary judgment is inappropriate if there is
sufficient evidence for a jury to return a verdict for the
nonmoving party).

In its motion for partial summary judgment, Jupiter moves
for judgment on Count II of Bamcor's complaint for a declaratory
judgment that its work was not deficient, on Count III of
Bamcor's complaint for slander and libel, and on its counterclaim
for breach of contract.  Jupiter also asks the court to find that
its purchase order controls the terms of the parties' agreement.
Bamcor makes a similar request, arguing that its price quotation
governs the terms of the parties' agreement, and because of this,
the limited liability provision precludes judgment in favor of
Jupiter.  Additionally, Bamcor argues that Jupiter does not have
sufficient evidence to establish that Bamcor broke the spray bar.

Because Bamcor's defamation claim is independent from the
contract, the court will address this matter first.  As a prelim-
inary matter, Ohio and Indiana have different defamation laws,

and the court must determine which law applies.  When a federal district court sits in diversity, it must determine the applicable substantive law based on the choice of law rules of its forum state.  Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); Storie v. Randy's Auto Sales, LLC, 589 F.3d 873, 879 (7th Cir. 2009).  When a case is transferred under §1404, the original forum state's choice of law principles continue to apply.  Van Dusen v. Barrack, 376 U.S. 612, 639, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964).  Here, the case was transferred from the Northern District of Ohio, and Ohio choice of law rules govern the court's analysis.

Under Ohio law, there is a presumption that the law of the place where the injury occurred governs tort actions.  Tanksley & Associates v. Willard Industries, Inc., 961 F.Supp. 203, 205 (S.D. Ohio 1997).  However, if another jurisdiction has a significant relationship to the incident, the court must consider which state has the most significant relationship.  Tanksley, 961 F.Supp. at 205.  In making this determination, the court considers: "(1) the place of the injury; (2) the place where the conduct causing the injury occurred; (3) the domicile, residence, nationality, place of incorporation, and place of business of the parties; (4) the place where the relationship between the parties, if any, is located; and (5) any factors under Section 6 [of

the Restatement of the Law of Conflicts] which the court may deem relevant to the litigation", and weighs these factors according to their relative importance.  Tanksley, 961 F.Supp. at 205.

The conduct giving rise to Bamcor's defamation claim occurred in Indiana where Jupiter employees allegedly made derogatory statements regarding Bamcor's workmanship.  In addition, Bamcor and Jupiter are located and operate their businesses in Ohio and Indiana respectively.  No other factors weigh in favor of applying Indiana law.  Although the events giving rise to the defamation claim, and presumably the evidence, favor Indiana, this is not sufficient to overcome the presumption that the law of the state where the injury occurred should control.  Because Bamcor operates in Ohio, any injury to its reputation will occur in Ohio.  The court will apply Ohio law to Bamcor's claims for defamation.

"'Defamation' occurs when a publication contains a false statement made with some degree of fault, reflecting injuriously on a person's reputation, or exposing a person to public hatred, contempt, ridicule, shame or disgrace, or affecting a person adversely in his or her trade, business or profession."  Jackson v. Columbus, 883 N.E.2d 1060, 1064 (Ohio 2008).  To establish defamation, a plaintiff must prove the following elements: "(1) the defendant made a false statement; (2) the false statement was

defamatory in the sense that it reflected unfavorably on the plaintiff's character or injured his or her trade or business; (3) the statement was published or communicated; and (4) the defendant acted with the necessary degree of fault."  Fuchs v. Scripps Howard Broadcasting Co., 868 N.E.2d 1024, 1033-34 (Ohio App. 2006).  The degree of fault that must be proven as part of the prima facie case varies depending on the notoriety of the victim, but at minimum negligence must be shown.  Fuchs, 868 N.E.2d at 1034.

Whether a communication is defamatory "depends upon the current of contemporary public opinion with result that words harmless in one era or in one community may be highly damaging to reputation at another time or in a different locality."  Burrell v. Moran, 82 N.E.2d 334, 335 (Ohio Com. Pl. 1948).  The communication is to be viewed in context and given its plain and natural meaning as to the idea that it intends to convey.  See Mucci v. Dayton Newspapers, Inc., 654 N.E.2d 1068, 1072 (Ohio Com. Pl. 1995) ("Words innocent on their face may, when placed in context, convey a defamatory meaning.").  Not only must the statement be false, it must also be one of fact, not opinion, to impose liability for defamation.  Rich v. Thompson Newspapers, Inc., 842 N.E.2d 1081, 1086 (Ohio App. 2005); Barlow v. Sipes, 744 N.E.2d 1, 8 (Ind. App. 2001) ("In order to recover in an action for defamation, that which caused the alleged defamation must be both

false and defamatory.").  In addition, the First Amendment pro-
tections ensuring the free interchange of ideas do not require
literal truth: "it is sufficient to show that the imputation is
substantially true, or as it is often put, to justify the 'gist,'
the 'sting,' or the 'substantial truth' of the defamation."
Cooper School of Art v. The Plain Dealer Pub. Co., 1986 WL 5294,
*2 (Ohio App. 1986).

Under Ohio law, there are two kinds of defamation, "defama-
tion per se occurs when material is defamatory on its face;
defamation per quod occurs when material is defamatory through
interpretation or innuendo."  Gosden v. Louis, 687 N.E.2d 481,
488 (Ohio App. 1996).  "In order to be actionable per se, the
allegedly defamatory statement must fit within one of four
classes: (1) the words import a charge of an indictable offense
involving moral turpitude or infamous punishment; (2) the words
impute some offensive or contagious disease calculated to deprive
a person of society; (3) the words tend to injure a person in his
trade or occupation; and (4) the words tend to subject a person
to public hatred, ridicule, or contempt."  American Chemical
Society v. Leadscope, 2010 WL 2396544, *12 (Ohio App. June 15,
2010) (citing Schoedler v. Motometer Gauge & Equip. Corp., 15
N.E.2d 958, 961 (Ohio 1938)).  Where the words are not per se
defamatory, but are susceptible to a defamatory meaning, they are
defamatory per quod.  Moore v. P.W. Publishing Co., 209 N.E.2d

13

412, 416 (Ohio 1965); American Chemical Society, 2010 WL 2396544, at *12. It is a matter of law for the court to decide whether an unambiguous statement constitutes defamation per se. American Chemical Society, 2010 WL 2396544, at *12; Becker v. Toulmin, 138 N.E.2d 391, 396 (Ohio 1956).

Jupiter calls into question the sufficiency of Bamcor's evidence to support its defamation claim. In response, Bamcor submitted the affidavit of James L. Balogh, a representative of Gilbane, Inc., who was retained to provide consulting services at Jupiter. Balogh claims that Brian Patrick, Jupiter's chief engineer, made statements to him "the essence of which" were that Bamcor was technically inept and that Bamcor could not be trusted due to its relationship with insurance companies. (Br. in Opposition ¶ 9) Jupiter has moved to strike Balogh's affidavit which would leave the record devoid of evidence of defamation, and argues that even if the court considers Balogh's affidavit, Bamcor cannot make a prima facie case of defamation or overcome its claim of qualified privilege.[1]

---

[1] Bamcor argues that Jupiter's motion fails because it did not comply with the Rule 37 meet and confer provision prior to filing its motion. However, Rule 37 only applies to discovery motions, and does not apply to motions to strike, as Jupiter filed here. Lapsley v. Xtek, Inc., 2008 WL 4690999 (N.D. Ind. 2008)(finding that Rule 37(b) was inapplicable to defendant's motion to strike).

14

To support a claim that has been challenged on summary judgment, an affidavit may not be based upon "self-serving statements . . . without factual support in the record." Thanongsinh v. Board of Education, 462 F.3d 762, 781 (7th Cir. 2006)(quoting Butts v. Aurora Health Care, Inc., 387 F.3d 921, 925 (7th Cir. 2004)). Rather, Rule 56(e) requires that an affidavit must be "made on personal knowledge [and] set forth facts as would be admissible in evidence." This rule further provides that an affidavit offered in opposition to a motion for summary judgment "must set forth specific facts showing that there is a genuine issue for trial." Drake v. Minnesota Mining and Manufacturing Company, 134 F.3d 878, 886 (7th Cir. 1998)(quoting Hadley v. County of DuPage, 715 F.2d 1238, 1243 (7th Cir. 1983)("Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter, rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted.").

In addition, a party resisting summary judgment may not "patch-up potentially damaging deposition testimony with a contradictory affidavit." Commercial Underwriters Insurance Company v. Aires Environmental Services, Ltd., 259 F.3d 792, 799 (7th Cir. 2001). See also Buckner v. Sam's Club, Inc., 75 F.3d 290, 292 (7th Cir. 1996)("[T]he law of this circuit does not permit a party to create an issue of fact by submitting an affidavit whose

15

conclusions contradict deposition or sworn testimony.").

Pursuant to Federal Rule of Civil Procedure 37(c)(1),
Jupiter seeks to strike Balogh's affidavit because Bamcor failed
to comply with Federal Rule of Civil Procedure 26(a)(1)(A) which
requires a party to provide "the name and, if known, the address
and telephone number of each individual likely to have discover-
able information that the disclosing party may use to support its
claims or defenses . . . , identifying the subjects of the infor-
mation."  Parties are required to supplement and amend these
disclosures "in a timely manner if the party learns that in some
material respect the disclosure or response is incomplete or
incorrect, and if the additional or corrective information has
not otherwise been made known to the other parties during the
discovery process or in writing".  Rule 26(e)(1).  The amendment
is considered timely if it is made within a reasonable time after
the new information is discovered.  "A party that without sub-
stantial justification fails to disclose information required by
Rule 26(a) or 26(e)(1) . . . is not, unless such failure is
harmless, permitted to use as evidence at a trial . . . any
witness or information not so disclosed."  Rule 37(c)(1).

When it is determined that a party has violated Rule 26, the
court must exclude the evidence that was not disclosed unless the
violation of Rule 26 was either justified or harmless. David v.
Caterpillar, 324 F.3d 851, 857 (7th Cir. 2003).  This decision is

left to the discretion of the trial court.  David, 324 F.3d at
857.  The Seventh Circuit has laid down several factors to guide
the court's analysis: "(1) the prejudice or surprise to the party
against whom the evidence is offered; (2) the ability of the
party to cure the prejudice; (3) the likelihood of disruption to
the trial; and (4) the bad faith or willfulness involved in not
disclosing the evidence at an earlier date." David, 324 F.3d at
857.  See Bronk v. Ineichen, 54 F.3d 425, 428 (7th Cir. 1995)
(citing Spray-Rite Serv. Corp. v. Monsanto Co., 684 F.2d 1226,
1245 (7th Cir. 1982)); Woodworker's Supply, Inc. v. Principal
Mutual Life Ins. Co., 170 F.3d 985, 993 (10th Cir. 1999).

Balogh's identity was disclosed to Jupiter minutes before
Bamcor filed its response to Jupiter's motion for summary judg-
ment although Balogh's affidavit was dated ten days before the
response.  Balogh never had been disclosed by Bamcor as a poten-
tial witness or identified in any of Bamcor's responses to Jupi-
ter's interrogatories.  At the close of discovery, and prior to
Bamcor identifying Balogh as a witness, Bamcor had no evidence to
support its defamation claim.  As the court explained in its
November 29, 2010 Order, Bamcor had the burden of identifying
witnesses and evidence to support its defamation claim within the
discovery period.  If Bamcor would have diligently pursued its
claim during the discovery period and taken Hoerchler's deposi-
tion, it would have discovered that Balogh also had information

17

relevant to its defamation claim. Permitting Bamcor to submit
Balogh's affidavit not only would violate the court's Rule 16
scheduling order, for which Bamcor has failed to show good cause
for its failure to procure the evidence within the discovery
period, but its untimely identification of Balogh also would
result in prejudice to Jupiter.

Discovery closed in this matter on January 29, 2010, before
the parties submitted their motions for summary judgment. It was
not until Jupiter pointed to Bamcor's lack of evidence in support
of its defamation claim that Bamcor first attempted to procure
evidence to support the same. The court cannot now reward
Bamcor's last minute attempt to support its defamation claim
despite the almost two years it had to do so. If the court chose
to consider Balogh's testimony, Jupiter would be disadvantaged
because the parties already have briefed and filed their motions,
responses, and replies to summary judgment. Jupiter was not
afforded the opportunity to conduct discovery on Balogh or given
time to prepare a defense in response. Furthermore, it would
unnecessarily delay these proceedings to re-open discovery for
the purpose of allowing Jupiter to conduct discovery on Balogh,
and any further evidence it may need to prepare its defense in
response, when there is no justification for Bamcor's failure to
procure any evidence to support its defamation claim within the
discovery period. Therefore, the court finds that the risk of

prejudice to Jupiter, the unnecessary delay, and Bamcor's failure to diligently pursue its claim and gather any evidence within the discovery period warrants the striking of Balogh's affidavit. A party cannot wait until the opposing side points out it lacks evidence to procure evidence to support its claim.

Absent Balogh's affidavit, the record is devoid of any other evidence to support Bamcor's defamation claim. No other evidence or witnesses identified within the discovery period have come forth with information concerning statements Jupiter personnel made regarding Bamcor's workmanship. Therefore, Jupiter's motion for partial summary judgment on Bamcor's defamation claim is GRANTED.

Assuming, arguendo, that the court considered Balogh's affidavit, Bamcor's defamation claim fails on the merits because the record is devoid of factual statements, as opposed to statements of opinion. To prevail on a claim for defamation, the statement must be one of fact, as opposed to opinion. White Mule Co. v. ATC Leasing Co. LLC, 540 F.Supp.2d 869, 898 (N.D. Ohio 2008). In deciding whether a statement is a protected opinion or an actionable factual assertion, a court must look at the totality-of-circumstances, but should focus on four issues: "(1) the specific language used in the assertion, (2) whether the statement is verifiable, (3) the general context of the statement, and (4) the broader context in which the statement appears." White Mule Co.,

540 F.Supp.2d at 898; Northeast Ohio College of Massotherapy v.
Burek, 759 N.E.2d 869, 876 (Ohio App. 2001); Scott v. News-
Herald, 496 N.E.2d 699, 706 (Ohio 1986).  In making this inquiry,
the court considers the specific statements.  White Mule Co., 540
F.Supp.2d at 898.  If reasonable minds could differ regarding the
implications of the defendant's statements, summary judgment is
inappropriate. Laurel Valley Oil Co. v. 76 Lubricants Co., 797
N.E.2d 1033, 1036 (Ohio App. 2003).

In light of the scant evidence supporting Bamcor's defama-
tion claim, it is impossible for the court to make the necessary
inquiry.  The only evidence Bamcor had to offer was Balogh's
affidavit, stating that: "during the period of 2007-2008," Brian
Patrick, "made statements . . . about Bamcor, LLC on at least two
separate occasions, the essence of which was that Bamcor, LLC was
technically inept, and that it could not be trusted due to its
relationship with insurance companies."  To support a defamation
claim it is vital for the party to submit the specific statement
the defamer is alleged to have made; failure to do so can be
fatal to one's claim.  Ashcroft v. Mt. Sinai Medical Center, 588
N.E.2d 280, 284 (Ohio 1990)(confirming trial court's grant of
summary judgment against plaintiff because she failed to cite
specific statements); Schuman v. Lake Hospital System, Inc., 1997
WL 123225, *5 (Ohio App. Feb. 28, 1997) ("Given the lack of evi-
dence as to any specific statement made in regard to appellant,

the granting of summary judgment was appropriate."). This is because one word can alter a statement from being considered a fact to an opinion, rendering the defamation claim unactionable. Northeast Ohio College of Massotherapy, 759 N.E.2d at 877 ("Burek did not allegedly state that the appellants were bankrupt but that they would go bankrupt, which is a critical distinction.").

Although Balogh's affidavit references the subject matter of the alleged statements, it fails to provide the specific statements Patrick made. Not only is this fatal to Bamcor's claim, but because this is the only evidence submitted to support Bamcor's defamation claim, Bamcor has failed to make a prima facie case. The burden is on the plaintiff to show that the opposing party's statement was one of fact, not opinion. See White Mule, 540 F.Supp.2d at 895 ("to prevail, 'a plaintiff must show that the defendant made a false representation of fact.'")(emphasis in original). However, it is impossible to discern from Balogh's affidavit whether Patrick's alleged statements were one of fact or opinion based on the evidence presented. Therefore, Bamcor has failed to point to a statement of fact and has not met its burden, and summary judgment must be GRANTED in favor of Jupiter on Bamcor's defamation claim.

To resolve the remaining claims both sides present, the court first must determine which contract governs the relationship between the parties. The dispute over whether Bamcor's

quotation or Jupiter's purchase order controls is a classic
battle of the forms.  See Thomas Engineering, Inc. v. Trane Co.,
1993 WL 276780, *2 (N.D. Ill. 1993) ("Where, as in this case, a
buyer and a seller of goods exchange forms having different terms
and then act as if they have formed a contract, a 'Battle of the
Forms' results.").  Whether the Uniform Commercial Code or common
law applies to resolve this dispute is determined by whether the
transaction is primarily one for goods or services.  WICO Corp.
v. Willis Industries, 567 F.Supp. 352, 355 (N.D. Ill. 1983)
(stating that the court must discern the dominant purpose of the
contract); Illinois Power Co. v. Figgie Intern, Inc., 1989 WL
152928, *6 (N.D. Ill. 1989)(same).  A good is defined as "all
things that are movable at the time of identification to a
contract for sale.  The term includes future goods, specially
manufactured goods . . . ."  U.C.C. §2-103; Illinois Power Co.,
1989 WL 152928, at *6.  The fact that a good subsequently is
attached to a facility is not determinative.  Illinois Power Co.,
1989 WL 152928, at * 6; Center Ice of Dupage, Inc. v. Burley's
Rink Supply, Inc., 1997 WL 43230, *3 (N.D. Ill. 1997).  In
discerning the dominant purpose of the contract, the court
considers several factors: (1) the language and structure of the
contract; (2) the way the parties characterize the contract; (3)
the cost of goods relative to the cost of the services; and (4)
whether the sale of goods is a prerequisite motivation of the

provision of services. Center Ice of Dupage, 1997 WL 43230, at *3.

Considering these factors, the parties' contract appears to be one predominately for services. Although Jupiter's purchase order refers to the parties as the buyer and the seller, the contract states that it is for the purpose of rebuilding certain equipment. Bamcor's quotation specifically lists the labor, equipment, and materials it promised to provide. Dominant among these were activities such as mounting, setting, removing, reassembling, reworking, cleaning, replacing, and fitting the equipment, all of which indicate that Bamcor was providing a service. The parts Bamcor had to purchase to complete these tasks were incidental to rebuilding the equipment. Therefore, the contract is predominately one for services, and common law governs the battle of the forms.

A contract exists when there is an offer, acceptance, consideration, and mutual assent. Krieg v. Hieber, 802 N.E.2d 938, 944 n.3 (Ind. App. 2004); Rodziewicz v. Waffco Heavy Duty Towing, 763 N.E.2d 491 (Ind. App. 2002); DiMixio v. Romo, 756 N.E.2d 1018, 1022 (Ind. App. 2001). At common law, "for an offer and an acceptance to constitute a contract, the acceptance must meet and correspond with the offer in every respect, neither falling within nor going beyond the terms proposed, but exactly meeting (those terms) at all points and closing with them just as they

stand." Gates v. Petri, 143 N.E.2d 293, 297 (Ind. App. 1957).
Both Indiana and Ohio recognize this "mirror-image" rule. Gold-
farb v. The Robb Report, Inc., 602 N.E.2d 328, 334 (Ohio App.
1991); I.C.C. Protective Coatings, Inc. v. A.E. Staley Mfg. Co.,
695 N.E.2d 1030, 1034 (Ind. App. 1998). "An acceptance which
varies the terms of the offer is considered a rejection and
operates as a counter-offer, which may be accepted by the origi-
nal offeror by performing without objection under the terms
contained in the counter-offer." Uniroyal, Inc. v. Chambers
Gasket & Mfg. Co., 380 N.E.2d 571, 575 (Ind. App. 1978).

Bamcor first sent Jupiter a price quotation. Paragraph 15
of the quotation's terms stated: "If this document is incorpo-
rated by reference in a purchase order or other document, any
commercial terms and conditions printed on the purchase order or
other document shall be null and void." Jupiter sent Bamcor a
purchase order in return, stating in relevant part, "per qte g
07-010-1 terms 10% down, 3% per week progressive payments net 10
days". (Purchase Order, Ex. 7 ¶ 1) Bamcor relies on this
statement, arguing that its price quotation is incorporated by
reference, and therefore the terms of its price quotation con-
trol. However, "per" can incorporate a portion of the document
it refers to and does not by its terms incorporate the entire
document. I.C.C. Protective Coatings, 695 N.E.2d at 1036; Krause
v. Oscar Daniels Co., 22 N.E.2d 544, 547 (Ohio App. 1939). By

24

following "per" with the specific terms, Jupiter unambiguously
incorporated only those terms.  Therefore, paragraph 15 in Bam-
cor's price quotation was not incorporated and does not govern
the court's analysis.

Rather, under the mirror-image rule, Jupiter's purchase
order constitutes a counter offer because its material terms
differed from those in Bamcor's quotation.  By performing after
receiving Jupiter's purchase order, Bamcor accepted the terms of
Jupiter's purchase order, which included a paragraph declaring
void all inconsistent and additional terms Bamcor previously
proposed.  Therefore, Jupiter's purchase order governs the dis-
pute between the parties.

In its motion for summary judgment, Bamcor argues that it
could not be held responsible for Jupiter's lost profits because
its price quotation controlled the parties' agreement and specif-
ically prohibited the recovery of lost profits.  However, Jupi-
ter's purchase order controls the parties' relationship and
specifically provides for the recovery of lost profits, rendering
Bamcor's argument moot.  Therefore, Bamcor's motion for summary
judgment is DENIED on this issue.

Moving to the heart of the parties' dispute, Jupiter's
counterclaim for breach of contract and Bamcor's request for
declaratory judgment, both parties argue that the opposing side
lacks sufficient evidence to succeed on its claim.  In particu-

lar, Jupiter argues that Bamcor cannot dispute Jupiter's theory on how the spray bar broke because Bamcor's expert testimony must be excluded, and the record is devoid of any other evidence to contradict Jupiter's experts. Bamcor makes a similar argument, asserting that Jupiter cannot establish that the broken spray bar is the same one it installed, nor is there evidence of record to show that the spray bar broke by any fault of Bamcor.

The admissibility of expert evidence is governed by Federal Rule of Evidence 702, Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and its progeny. Winters v. FruCon, Inc., 498 F.3d 734, 741 (7th Cir. 2007). Rule 702 provides:

> If scientific, technical, or other special-ized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the prod-uct of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Under Daubert, the court exercises a "gatekeeping" function to ensure that expert testimony is both reliable and relevant pursuant to Rule 702. Winters, 498 F.3d at 741; Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 141, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). The examination applies "to all kinds of

expert testimony."  United States v. Conn, 297 F.3d 548, 555 (7th Cir. 2002)(noting that Rule 702 makes no distinction between "scientific" knowledge and other forms of specialized knowledge)(citing Kumho Tire, 526 U.S. at 149).  The main purpose of the court's gatekeeping requirement "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  Kumho Tire, 526 U.S. at 152.

In light of Daubert and Kumho Tire, the Seventh Circuit has endorsed a two-step analysis for district courts to use in evaluating expert testimony under Rule 702:  first, the court must determine whether the expert's testimony is "reliable;" and second, the court must determine whether the expert's testimony is "relevant."  Hardiman v. Davita Inc., 2007 WL 1395568 (N.D. Ind. May 10, 2007).  Like all questions of admissibility, these regarding a witness' testimony are matters of law to be determined by the judge.  Hardiman, 2007 WL 1395568 at *2 (quoting and citing Porter v. Whitehall Labs, Inc., 791 F.Supp. 1335, 1342 (S.D. Ind. 1992), aff'd, 9 F.3d 607 (7th Cir. 1993).  "The burden of showing an expert's testimony to be relevant and reliable is with the proponent of the evidence."  Bickel v. Pfizer, Inc., 431 F.Supp.2d 918, 921 (N.D. Ind. 2006).

To satisfy the reliability requirement, the expert must be
qualified in the relevant field and his opinion must be based on
sound methodology.  Smith v. Ford Motor Co., 215 F.3d 713, 718
(7th Cir. 2000).  See also Hardiman, 2007 WL 1395568 at n.1
(discussing courts' ability to combine the qualifications inquiry
into the reliability prong).  In determining whether an expert is
qualified to render an opinion, the court should consider his
"full range of practical experience as well as academic or tech-
nical training . . . ."  United States v. Parra, 402 F.3d 752,
758 (7th Cir. 2005)(quoting Smith, 215 F.3d at 718).  Still, "[a]
court's reliability analysis does not end with its conclusion
that an expert is qualified to testify about a given matter . . .
[T]he court's gatekeeping function [also] focuses on an examina-
tion of the expert's methodology."  Smith, 215 F.3d at 718.
Hence, an expert's work is admissible "only to the extent it is
reasoned, uses the methods of the discipline, and is founded on
data."  "Talking off the cuff — deploying neither data nor
analysis — is not an acceptable methodology."  Lang v. Kohl's
Food Stores, Inc., 217 F.3d 919, 924 (7th Cir. 2000).

Daubert outlined the following factors in assessing an
expert's methodology:

> (1) whether a theory or technique . . . can
> be (and has been) tested; (2) whether the
> theory or technique has been subjected to
> peer review and publication; (3) the known or
> potential rate of error; (4) the existence

> and maintenance of standards controlling the
> technique's operation; and (5) whether the
> technique or method has met with general
> acceptance.
>
> Conn, 297 F.3d at 555 (quoting Daubert, 509
> U.S. at 593-94, 113 S.Ct. at 2797)

No matter what type of specialized information is proffered, "the Daubert factors set forth above ought not be considered a definitive check list suitable for the evaluation of all kinds of evidentiary submissions involving specialized knowledge." Conn, 297 F.3d at 555-56. The list should be flexible "to account for the various types of potentially appropriate expert testimony" rather than definitive or exhaustive. Deputy v. Lehman Bros., Inc., 345 F.3d 494, 505 (7th Cir. 2003). The court may tailor its approach using the Daubert factors as a starting point in an effort to evaluate the particular evidence before it. Conn, 297 F.3d at 556.

The expert testimony must "fit the issue to which the expert is testifying." Chapman v. Maytag Corp., 297 F.3d 682, 687 (7th Cir. 2002)(internal citations and quotes omitted). Further, "[i]t is critical under Rule 702 that there be a link between the facts or data the expert has worked with and the conclusion the expert's testimony is intended to support." United States v. Mamah, 332 F.3d 475, 478 (7th Cir. 2003)(citing Gen. Elec. v. Joiner, 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997)). The Supreme Court has held that "nothing in either

Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert." Gen. Elec., 522 U.S. at 146, 118 S.Ct. at 519. Therefore, an expert "who invokes 'my expertise' rather than analytic strategies widely used by specialists is not an expert as Rule 702 defines that term." Zenith Elec. Corp. v. WH-T Broad. Corp., 395 F.3d 416, 419 (7th Cir. 2005). See also Mamah, 332 F.3d at 478 ("The court is not obligated to admit testimony just because it is given by an expert."). Rather, the Seventh Circuit has reiterated: "An expert who supplies nothing but a bottom line supplies nothing of value to the judicial process." Zenith Elec. Corp., 395 F.3d at 419 (collecting cases of reiteration).

Once evidence is deemed reliable, it still must be excluded if it is not relevant, which under Rule 702 means that it is not likely "to assist the trier of fact to understand the evidence or determine a fact in issue . . . ." United States v. Hall, 93 F.3d 1337, 1342 (7th Cir. 1996). The expert testimony must relate to an issue in the case or it is not relevant. Daubert, 509 U.S. at 591, 113 S.Ct. at 2795-96. To "assist" a jury, the Seventh Circuit has explained that the expert testimony will not aid a jury if it "addresses an issue of which the jury is already generally aware, and it will not contribute to their understanding of the particular dispute." Hall, 93 F.3d at 1104. Alterna-

tively, if because of the expert's knowledge of relevant facts,
the expert's particular use of those facts "will help the trier
determine a fact, then the opinion is admissible under Rule 702."
Porter, 791 F.Supp. at 1343.

Jupiter first calls into question Carbonara's qualifica-
tions.  Carbonara holds a Bachelor of Science Degree in physics,
engaged in graduate studies in physics and metallurgy, and
received a Phd in materials science.  Carbonara identifies
himself as a material scientist with expertise in the area of
failure science.  Material science is the study of materials and
how they respond to various environments, either forces or
chemical environments, and their reaction to those.  Carbonara
admittedly has no expertise in tribiology, the study of gear
wear, friction, and lubrication, and did not conduct an analysis
of gear wear in this case.  Neither did Carbonara author the
Analysis of Gear Wear Section of Bamcor's expert report.  In
light of Carbonara's lack of experience in gear wear and his
failure to perform a gear wear analysis, Jupiter argues that he
is not qualified to testify to such.

Jupiter is correct that Carbonara lacks the expertise to
testify to gear wear and tribiology.  Jupiter conveniently
ignores the section of the expert report entitled "Analysis of
the Spray Bar Failure."  This section analyzes possible ways the
spray bar could have broke from the application of force, such as

that exerted by Jupiter personnel when they pulled the flange after the gear box stopped running.  Carbonara also has published articles on the surface analysis of lubrication on metals and has testified to failures involving lubrication.  This experience qualifies him to give his opinion that the smoke was from oil hitting the gears.  Although Jupiter's theory on how the spray bar broke is premised on tribiology, Bamcor is permitted to advance other theories.  Carbonara's experience with how metals react under force and in different chemical environments qualifies him to give his testimony, which is different from Jupiter's gear wear theory, and therefore does not demand the same qualifications.

Jupiter makes a similar argument regarding Bookwalter's qualifications.  Bookwalter is a mechanical engineer at SEA, Ltd. He holds a Bachelor of Science Degree and a Master of Science degree in Mechanical Engineering, with a specialty in machine design.  Bookwalter testified that tribology studies are part of the curriculum for mechanical engineering, but that he does not hold an advanced degree in this field nor does he claim he is an expert in gear wear.  Bookwalter represents that he has spent his career analyzing machines and how they break and has published an article analyzing a lubrication failure involving a metal power screw that led to a mechanical failure of a hospital bed. Because Bookwalter does not claim that he reached his conclusion based on

the wear on the gears, as a tribology expert could, his expertise in analyzing the reasons why machines break makes him qualified to give expert testimony on how the gearbox broke.

Jupiter further argues that Carbonara and Bookwalter's opinions are inadmissible because they are not based on sufficient facts or data of record. Carbonara and Bookwalter's expert report is premised on a Jupiter employee using a tool to pry or leverage the pipe, resulting in the spray bar breaking. However, Jupiter argues that the record is devoid of evidence showing that a Jupiter employee used a tool to leverage the pipe. While the record is devoid of any direct evidence that a Jupiter employee used a tool to leverage the pipe, the nature and fracture of the spray bar present circumstantial evidence to support the allegation. Furthermore, there is no direct evidence on how the spray bar actually was broken. Carbonara and Bookwalter's testimony advances another theory on what could have happened. In light of the circumstantial evidence consisting of the nature and fracture of the spray bar, Carbonara and Bookwalter's expert opinion is sufficiently connected with the facts of record.

In its final attempt to have Carbonara and Bookwalter's expert testimony excluded, Jupiter argues that their analysis of Schmid and Hineman's report is improper and inadmissible because it improperly attacks Schmid and Hineman's credibility. In particular, Carbonara and Bookwalter's report criticizes the

factual basis of Schmid and Hineman's opinion, does not address Schmid and Hineman's methodology or calculations, and offers Carbonara and Bookwalter's opinion of Schmid and Hineman. An expert may criticize the methods, calculations, and conclusions offered by the opposing side's expert. 1st Source Bank v. First Resource Federal Credit Union, 167 F.R.D. 61, 65 (N.D. Ind. 1996). Such criticisms aid the trier of fact in determining how much weight to assign the expert's opinion in deliberation. Fafara v. McMahon, 2006 WL 5086618, *5 (N.D. Ind. 2006). However, experts are limited in what they can testify to and cannot attack the credibility of other experts. Fafara, 2006 WL 5086618, at *5 (citing United States v. Carter, 410 F.3d 942, 950 (7th Cir. 2005); United States v. Welch, 368 F.3d 970, 975 (7th Cir. 2004); Richman v. Sheahan, 415 F.Supp.2d 929, 941-42 (N.D. Ill. 2006) ("A fundamental premise of our system of trial in both civil and criminal cases is that determining the weight and credibility of witness testimony is for the jury, who are presumed to be fitted for the task by their natural intelligence and their practical knowledge of the affairs of life")).

Carbonara and Bookwalter's analysis of the Schmid and Hineman report consists of two paragraphs. Paragraph one discusses evidence that Schmid ignored in his report, including that the spray bar was assembled outside of the gearbox. "When facts are in dispute, experts sometimes reach different conclusions

based on competing versions of the facts." Fafara, 2006 WL 5086618, at *5 (quoting Advisory Committee Note to 2000 Amendment). An opposing expert can show why the expert's opinion does not hold up under the facts as they present them to be. This is because it is the duty of the trier of fact to decide the underlying fact. Once the trier of fact decides the underlying facts, such testimony is relevant to the trier of fact's deliberations concerning the weight to assign to each expert's testimony. Here, the trier of fact must determine whether the spray bar was tightened prior to relying on the first theory Schmid advances. Because there is conflicting evidence in the record concerning whether the spray bar was tightened, namely Titchenell's deposition, Titchenell's affidavit, and the expert's observations of the nature of the fracture and gear wear, it is necessary for Carbonara and Bookwalter to point out the facts Schmid did not consider and how his theory fails under the facts as Bamcor perceives them to be.

Furthermore, paragraph two of Carbonara and Bookwalter's opinion criticizes Schmid and Hineman's report on the grounds that forces, gear speeds, and fundamentals of lubrication were not considered and would ultimately affect their conclusions. This testimony attacks the methodology of Schmid and Hineman's analysis and is permissible under Rule 702. Based on the forego

ing reasons, Jupiter's motion to exclude Carbonara and Bookwalter is DENIED.

Jupiter's motion for summary judgment on its breach of contract claim and Bamcor's declaratory judgment claim is based entirely upon the court excluding Bamcor's experts and the record then being devoid of evidence to contradict Schmid's opinion. Because the court denied Jupiter's motion to exclude, its motion for summary judgment is also DENIED with respect to these claims.

Bamcor's motion for summary judgment is premised on a similar theory as Jupiter's. Bamcor argues that the record is devoid of evidence that the spray bar is the same one it installed or that Bamcor broke the spray bar during installation. In support of its position that the spray bar is not the same one it installed, Bamcor claims that the spray bar found in the bottom of the gearbox did not have the Loctite which Titchenell testified he applied and that it was a different brand than the one it ordered for the repair. However, Jupiter introduced evidence that it did not change the spray bar from the time it received the gearbox from Bamcor to the time the gearbox stopped working. Therefore, there is conflicting evidence concerning whether the spray bar is the same one that Bamcor installed. It is the duty of the trier of fact to sift through this evidence and determine which theory is more credible in light of the evidence. There

fore, there remains a genuine issue of material fact and Bamcor's motion for summary judgment is DENIED under this theory.

Next, Bamcor argues that Jupiter cannot prove that Bamcor broke the spray bar during installation.  In response, Jupiter submitted its experts' reports which state that the spray bar could have been broken by over tightening after it was installed inside the gearbox.  Bamcor moves to exclude Jupiter's expert reports on the ground that they are not supported by sufficient evidence of record because Titchenell fabricated and installed the spray bar outside of the gearbox before it was placed in the saddles and did not tighten the spray bar after it was installed in the saddles of the gearbox.  However, whether the spray bar was tightened before or after it was installed in the saddles remains in dispute.  Titchenell testified in his deposition that the spray bar could not have been installed in the gearbox in one piece and that he assembled and tightened it in the gear box after the gears were in place.  Then he contradicted his testimony when he submitted an affidavit stating that the spray bar was installed outside of the gearbox and that he did not manipulate it after installation into the saddles.  For this reason, the court first will address Jupiter's motion to strike Titchenell's affidavit.

A party resisting summary judgment may not "patch-up potentially damaging deposition testimony with a contradictory affi-

davit." Commercial Underwriters Insurance Company v. Aires Environmental Services, Ltd., 259 F.3d 792, 799 (7th Cir. 2001). See also Buckner v. Sam's Club, Inc., 75 F.3d 290, 292 (7th Cir. 1996)("[T]he law of this circuit does not permit a party to create an issue of fact by submitting an affidavit whose conclusions contradict deposition or sworn testimony."). "Affidavits, though signed under oath by the affiant, are typically and here written by the affiant's lawyer, and when offered to contradict the affiant's deposition are so lacking in credibility as to be entitled to zero weight in summary judgment proceedings unless the affiant gives a plausible explanation for the discrepancy." Beckel v. Wal-Mart Associates, Inc., 301 F.3d 621, 623 (7th Cir. 2002) (citing Cleveland v. Policy Management Systems Corp., 526 U.S. 795, 806-07, 119 S.Ct. 1597, 143 L.Ed.2d 966 (1999); Russell v. Acme-Evans Co., 51 F.3d 64, 67-68 (7th Cir. 1995); Hackman v. Valley Fair, 932 F.2d 239, 241 (3rd Cir. 1991). The reason for the discrepancy must be apparent from the affidavit itself. Beckel, 301 F.3d at 623. In conducting this analysis, the court will scrutinize the reason for the discrepancy, taking into consideration whether the lawyer introducing the affidavit was present at the deposition and could have asked questions to clarify matters. Beckel, 301 F.3d at 621, 623-24. However, affidavits offered to clarify or expand on the witness' testimony are admissible if the line of questioning at the deposition was

ambiguous or incomplete.  Fisher v. Avanade, 519 F.3d 393, 406
(7th Cir. 2008) (citing Shepherd v. Slater Steels Corp., 168 F.3d
998, 1007 (7th Cir. 1999)).

Bamcor and Jupiter dispute whether Titchenell's deposition
and affidavit contradict or whether the affidavit supplements an
otherwise ambiguous line of questioning.  Titchenell's deposition
provides in relevant part:

> A.   It was all fitted before the gears went
>      in.  But it was not assembled until
>      after the gears were in.
>
> Q.   Okay.  So it wasn't installed as one
>      solid piece?
>
> A.   It couldn't have been. . . .
>
> A.   It was all fitted.  It was all — I don't
>      know how to explain it to you.  If some-
>      thing like that in that application,
>      knowing there's other things that's
>      going to go on top of it, we may fit it
>      so that it's already together.  And all
>      you have to do is be installed, as far
>      as maybe threading one fitting into
>      another to complete the job.
>
> Q.   So when you did install it, there was
>      still a process; it wasn't complete, you
>      still had to thread something —
>
> A.   Correct. . . .
>
> Q.   After the spray bars and the saddles,
>      the flange is already existing, you put
>      that there, and you used a wrench to
>      tighten it in, too, or just hand?
>
> A.   No. I used a wrench.

The questions immediately preceding this testimony discussed solely the spray bar and did not refer to the entire assembly, which includes the flange pipe and the elbow that Bamcor now argues Titchenell was referencing.

Jupiter argues that paragraphs 9 and 10 of Titchenell's affidavit, stating that the spray bar was assembled in entirety before it was installed in the gearbox and was not manipulated in any manner after installation, directly contradicts his deposition testimony that the spray bar was not installed in one piece and that the spray bar was fitted before the gears were put in, but was not assembled until after the gears were installed.  The spray bar must have been either completely assembled at installation, as Titchenell's affidavit offers, or impossible to install in one piece as Titchenell stated in his deposition.  For this reason, there is a direct conflict between his affidavit and deposition.  However, this does not end the court's analysis.  The court must look to whether Bamcor provided an adequate explanation for this discrepancy, whether the questions were phrased in a confusing manner, or whether the deposition was open to more than one interpretation.  Cowan v. Prudential Ins. Co. of America, 141 F.3d 751, 756 (7th Cir. 1998)(considering an affidavit because the deposition questions were confusing); Shepherd, 168 F.3d at 1004-05 (considering a contradicting affidavit because the deposition was open to more than one meaning).

Titchenell's affidavit suggests that he was referring to the entire spray bar assembly and not solely the spray bar when he was explaining the assembly and installation process in his deposition. Titchenell explained the same process in his affidavit as he did in his deposition, this time specifying which pipes he was referring to. At his deposition, Titchenell also referred to the flange, which is part of the spray bar assembly. The parties did not at any time during the deposition explain whether they were referring solely to the spray bar or the entire assembly. The distinction easily could be confused, particularly because the questions concerned the assembly of the gearbox, which included the entire spray bar assembly. For these reasons, Titchenell's deposition testimony is susceptible to more than one interpretation, and he must be permitted to clarify his explanation. Therefore, Jupiter's motion to strike Titchenell's affidavit is DENIED.

In light of the court allowing Titchenell's affidavit to stand, Bamcor argues that the record is devoid of any evidence that Titchenell tightened the spray bar, and absent such evidence Schmid and Hineman's opinions are not supported and based off of the facts of this case. Taking Titchenell's affidavit into consideration, there is no direct evidence to support Schmid and Hineman's theory that the spray bar broke from over tightening it during installation. However, as Bamcor argued in opposition to

Jupiter's motion to exclude Carbonara and Bookwalter, there is circumstantial evidence to support their opinions. Schmid and Hineman based their theories on how the gears wore, the nature of the fracture, and the tool marks that were found on the spray bar. Therefore, there is sufficient physical evidence to support their theories. Any criticisms of evidence not taken into consideration goes to the weight the trier of fact should assign to the expert reports and not to there admissibility.

Furthermore, Schmid's report also advances the theory that the spray bar could have been broken by tightening the horizontal bar perpendicular to the spray bar. Titchenell admitted in both his deposition and affidavit that he tightened this bar. Similarly, Hineman's report stated that the spray bar fractured during installation, but he did not provide a reason for how or to what part of the spray bar the force was applied to cause it to break. For these reasons, Bamcor's motion to exclude Schmid and Hineman's expert opinions is DENIED.

Because Bamcor's motion to exclude Schmid and Hineman's reports was denied, and their report contains evidence suggesting that Bamcor broke the spray bar during installation, a triable issue of material fact remains concerning when and why the spray bar broke. For this reason, Bamcor's motion for summary judgment is DENIED.

_____

Based on the foregoing, the Motion to Exclude Expert Testimony of Robert Carbonara and Jeffrey Bookwalter [DE 115] filed by the Defendant, Jupiter Aluminum Corporation, on March 1, 2010, is DENIED; the Motion for Partial Summary Judgment [DE 117] filed by Jupiter Aluminum on March 1, 2010, is GRANTED IN PART and DENIED IN PART; the Motion for Summary Judgment [DE 120] filed by the plaintiff, Bamcor, LLC, on March 1, 2010, is DENIED; the Motion to Exclude the Testimony of Steven Schmid, Ph.D. and Mark Hineman [DE 121] filed by the plaintiff on March 1, 2010, is DENIED; the Motion to Strike Portions of the Affidavit of Derrick Titchenell [DE 125] filed by the defendant on April 12, 2010, is DENIED; and the Motion to Strike Affidavit of James L. Balough and Bamcor's Amendment to Interrogatory Responses [DE 140] filed by the defendant on October 7, 2010, is GRANTED.

ENTERED this 7th day of February, 2011

s/ Andrew P. Rodovich
United States Magistrate Judge